SANITARY DIST. OF CHICAGO v. RICKER et al.

(Circuit Court of Appeals, Seventh Circuit. February 7, 1899.)

No. 511.

1. MUNICIPAL CORPORATIONS—CONTRACTS—RIGHT OF CONTRACTOR TO RESCIND.
    The trustees of the sanitary district of Chicago, as representatives of a municipal corporation required by law to let contracts for public work to the lowest bidder after advertisement, are not bound to exercise diligence to obtain information concerning the nature or cost of the work for the benefit of the bidders, with whom they deal at arm's length, their sole duty in that regard being to the corporation; and a contractor for the excavation of a section of the drainage canal is not entitled to a rescission of his contract because he encountered a substance more difficult and expensive to excavate than anything he was led to expect from an examination of the profile and data in the office of the chief engineer,—no intentional fraud being charged against the trustees or engineer,—nor because some of the trustees knew, or should have known, of the existence of further information on the subject of which they did not inform the contractor.

2. SAME—REPRESENTATIONS OF OFFICER.
    The chief engineer of the sanitary district of Chicago is not authorized by virtue of his office to bind the trustees, whose duty it is under the law to let contracts for work on the drainage canal, nor the district, by representations made to an intending bidder as to the nature of the materials to be excavated in a given section of the work; much less by expressions of opinion thereon.

3. SAME—KNOWLEDGE OF INDIVIDUAL TRUSTEES.
    The sanitary district of Chicago is represented by its board of trustees as a body, and cannot be held responsible because certain individual
    91 F.—53

trustees had knowledge of information regarding the materials likely to be encountered in the excavation of a section of the canal which was not contained in the profile exhibited for the information of bidders, and did not communicate such knowledge to an intending bidder.

4. CONTRACT—RESCISSION—UNREASONABLE DELAY.

A contractor for excavating a section of a canal discovered material to be excavated which he claimed was not contemplated by his contract, and authorized its rescission. He continued the work, however, for six months thereafter, without legal excuse for so doing if the contract was not in effect. *Held*, that he could not then abandon the work, and maintain a suit for the rescission of the contract, to recover for the work done on a quantum meruit.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This appeal is from a decree in favor of the appellees, Ricker, Lee, and Owens, co-partners under the name of Ricker, Lee & Co., against the appellant, the sanitary district of Chicago, setting aside and rescinding a contract for the excavation of a mile (called "Section F") of the drainage canal. 89 Fed. 251. The decree, besides confirming the report of the master, to whom the case had been referred, by agreement of parties, to take and report the evidence, with his conclusions thereon, and annulling the agreement and the bond given by the appellees to secure the performance of the contract, ordered a reference back to the master to take mutual account of all dealings and transactions between the parties, and touching the expenditures, work, labor, services, and materials furnished by the complainants by reason of the contract and bond, making to the parties all just allowances, the balance found due either party to be paid as the court shall direct, and the consideration of costs and all other direction being reserved until the master should make his report, when either party might apply to the court as occasion shall require. The appellant filed numerous exceptions to the master's report, but at the hearing below it was assumed, both by counsel and the court, "that the master's findings of fact were substantially correct." One of the contentions of the appellant is that the bill charges an intentional fraud, and presents no other ground for relief. The averments pertinent to that question are as follows:

"Your orators further represent unto your honors that said data, so furnished to said Nathaniel H. Ricker and said Charles V. Weston, of the material to be excavated in making and constructing said section F of said part of said main drainage channel, showed said material, to be so excavated from said section F, as aforesaid, to consist and be composed and formed of loam, sand, blue clay, blue clay and sand, blue clay and gravel, yellow clay, bowlders, and quicksand overlying bed rock, and bed rock; that said loam, sand, blue clay, blue clay and sand, blue clay and gravel, yellow clay, bowlders, and quicksand overlaid said bed rock in various strata, and at various and divers depths; and that said several strata of loam, sand, blue clay, blue clay and sand, blue clay and gravel, yellow clay, bowlders, and quicksand varied in thickness and in position at the different places where said tests were made. On or about March 1st, 1894, your orators, while so executing said contracts as aforesaid, came upon an extensive stratum of material to be excavated in said section F, overlying bed rock; and at a depth of about twelve feet from the surface of the ground, which said material was of a very hard nature and intractable; that the said material is a conglomerate rock, formed of bowlders and clay cemented together. Your orators further represent unto your honors that the said material so developed by your orators in the prosecution of their said work in said section F is wholly and totally unlike any material shown by the data so furnished to your orators, as aforesaid, by the said sanitary district of Chicago; * * * that said material must be drilled and blasted and broken up before it can be shoveled or removed, and that said material costs a great deal more per cubic yard to excavate than the sum of, to wit, 23¾ cents per cubic yard, received by

your orators under said contract for excavating glacial drift. And your orators further represent unto your honors that they are informed and believe, and so allege the fact to be, that prior to the time of letting of said contract unto your orators for the performance of said work upon said section F, and prior to the time of the furnishing of said data and the exhibiting of said profiles to said Nathaniel H. Ricker and Charles V. Weston, as aforesaid, by the chief engineer of said sanitary district of Chicago, for the purpose of having your orators submit proposals for the doing of said work on said section F, said board of trustees of said sanitary district of Chicago had information and knowledge of the existence of said hard and intractable material, and knew that the same would be encountered in large quantities on said section F in making the excavations thereof under the contract entered into between your orators and said sanitary district of Chicago. That said board of trustees then were informed and had knowledge that said hard and intractable material was very difficult and expensive to excavate; that it could not be excavated by any of the methods used to excavate loam, sand, blue clay, blue clay and sand, blue clay and gravel, yellow clay, bowlders, and quicksand, but that the same had to be drilled, blasted, and broken up like ordinary rock before it could be excavated or removed; and that said board of trustees then knew that it was much more costly to handle than said loam, sand, blue clay, blue clay and sand, blue clay and gravel, yellow clay, bowlders, and quicksand, so indicated by said data and profiles, as aforesaid, and that the price stipulated in said contract to be received by your orators for excavating 'glacial drift' would not compensate your orators for the excavating of said hard and intractable material; and that said board of trustees had knowledge and information that the said data and said profiles so furnished to your orators, as aforesaid, for the purpose of submitting proposals for the doing of said excavating on said section F, were not a fair and approximate representation or estimate of the materials to be excavated thereon, but that the same was unreliable and incorrect and untrustworthy as a guide for making proposals for the doing of said work on said section F."

The master's report is too long to be given in full, the "findings of fact" embracing much that is merely a statement of evidence upon points in respect to which no conclusion is stated. The portions of the finding now most material to be considered are as follows:

"(1) That in the month of August, 1892, defendant, the sanitary district of Chicago, having divided part of the main drainage canal * * * into six sections, designated, respectively, 'A,' 'B,' 'C,' 'D,' 'E,' and 'F,' caused to be published, in accordance with the law, a notice of the terms and conditions upon which contracts for the work of excavating would be let, and requested sealed proposals for such excavation. That, among other things, said notice contained the following: 'Specifications and plans may be seen at the office of the chief engineer, Room D, Rialto Building, Chicago, Ills.'

"(2) That in September, 1892, complainants employed Charles V. Weston, an experienced civil engineer, to assist them in obtaining information touching the material to be excavated, and in formulating bids for such excavation. That Weston thereupon went to the offices of said sanitary district, where he obtained a copy of the proposals and of the specifications and form of the contract for excavation required. That at that time he also saw exhibited, in one of the offices of the sanitary district, a profile showing the contour of the ground, the grades of the bottom of the proposed main channel, the alignment thereof, topography of the Desplaines valley, the course of the river, and the proposed river diversion; also plans showing the cross section of the channel at various points. That thereupon Weston communicated to complainants the information he had received. That about two weeks later, and about the first of October, 1892, complainant Ricker came to Chicago, and with Weston visited the office of the chief engineer of the sanitary district, Mr. Benezette Williams, and made a more careful examination of the plans and profiles on file and on exhibition to bidders. That the profile then seen and examined by Weston and Ricker was a tracing on linen or ordinary profile paper. * * * That on this profile was platted the contour of the ground on the line of the canal, and below that was given the line indicating the bottom of the channel with relation to the datum line.

That stations were indicated every 500 feet, and at various points along the line were platted horizontal lines and vertical lines, between which horizontal lines was indicated the character of the material extending down to bed rock. That this profile was made from five borings taken under Mr. Williams, and that section F is little less than a mile in length. That Weston took memoranda or notes in a small book, of the material indicated by said profile, showing what material was to be excavated on section F. . That such notes were taken from the profile at each point thereon where the material was so indicated, the location of these points being shown by a station number on this profile. * * * That after complainant Ricker and Weston had examined this profile, and notes had been made from it, as aforesaid, they had a conversation with the chief engineer, Williams, touching the profile and its reliability. That Weston inquired of Williams whether the data shown on the profile were approximately correct and could be relied upon, to which said Williams replied that he thought it could; that the determinations were carefully taken and tabulated, and he thought it was reasonably reliable. That Weston then said to Williams that they were going down the line, to which Williams replied that he thought it would be a very good idea, and suggested that they make an examination of the spoil bank of the Illinois-Michigan canal, and that he thought that would be as good evidence as anything that could be found as to what would. likely be met with in excavating the new canal. That after such conversation complainant Ricker and said Weston went down to the place of the projected canal, and examined to some extent the entire line, including sections A to F. That at that time a large part of section F was under water, so that the surface could not be examined. That they, however, made an examination of the spoil bank of the canal adjacent to section F, and that they found there sand, clay, gravel, and occasional bowlders. That during the next few days, and before the 19th of October, Weston and Ricker had visited the office of the chief engineer of the defendant several times, and had further conversations with the chief engineer, and during such conversations similar statements were made touching the profile and its reliability as at the first interview.

"(3) That on the 19th day of October, 1892, complainants filed with the clerk of defendant a sealed proposal, addressed to the board of trustees of defendant. * * * That on the 23d day of November, 1892, the complainants and the defendant entered into a written contract bearing that date. * * * That in the specifications attached to and made a part of the contract it was, among other things, provided as follows: '(13) Classification of material: All material excavated under the provisions of this contract is to be classified under one or the other of two heads, viz. "glacial drift" and "solid rock." Glacial drift shall comprise the top soil, earth, muck, sand, gravel, clay, hardpan, bowlders, fragmentary rock displaced from its original bed, and any other material that overlies bed rock. Solid rock shall comprise all rock found in its original bed, even though it may be so loosened from the adjacent underlying rock that it can be removed without blasting.'

"(4) That it appears by the evidence that at the time of the making of this proposal for bids by defendant, and at the time of the examination by complainant and Weston of the profile in the office of the chief engineer of defendant, and at the time of the conversation between Weston and the chief engineer touching the reliability of the information contained in such profile, there was in possession of the defendant other and further information touching the character of the material to be excavated on said section F, which was not shown or communicated to the complainants or to Weston. That among the data so in the possession of the defendant was a series of eleven borings made in the year 1890, partly upon and partly adjacent to the main drainage channel upon section F, under direction of Lyman E. Cooley, then chief engineer of the defendant. That the results of such boring were reported by the persons making the same, and tabulated and on file in the office of the defendant. That several of these Cooley borings showed material to be excavated of a very different character from that disclosed by the borings shown upon profile exhibited to complainants. That one of these borings, designated as 'Number 82,' contains the following entry, 'blue clay and gravel, very hard;' that number 88 contained the following,

'hard blue clay, gravel, and small stone;' that number 89 contains the following, 'hard blue clay;' that number 90 contains the following, 'hard blue clay with gravel;' that number 92 contains the following, 'hard blue clay with gravel,' and again, at a greater depth, 'hard blue clay with gravel.' That Mr. Cooley, being called on behalf of defendant, testified on direct examination that at the time of the letting of the contract by defendant to complainants, or prior thereto, he had no information or knowledge of the existence of the hard material on section F, and first learned of its existence when it was developed by complainants. That on cross-examination he further testified that it was impossible, many times, to determine by the Cooley borings whether the material was gravel or hardpan carrying gravel, for the reason that gravel resists a boring even more than hardpan, and it is sometimes impossible to distinguish between them; that the results of these borings were of such a character as to leave him entirely in the dark as to the material to be excavated between Summit and Sag; that he communicated to the engineering committee of defendant the fact that, in his judgment, there was an uncertainty of three million dollars in any estimate that could be made of the cost of excavation for the ten miles between Summit and Sag, owing to the want of accurate information; that, because of the unsatisfactory nature of the information obtained of such borings, he made a recommendation to the trustees of defendant that they be discontinued; that the information obtained from some of the entries in the reports of these borings, while they did not show that it would or would not be hardpan, did show that it was a difficult material to bore; and that, in the opinion of the inspector, it was unquestionably hard material; that such information would put a man on his guard as to what such material really was; that he, however, did not share the views of the inspectors as to the certainty of the indications, but simply took them as meaning that they were having great difficulty in boring; that the indications were uncertain; that the material might be hard, but that its real nature could not be determined with certainty without test pits; that there was sufficient probability that a portion of the material was hard material to make it necessary, for the proper protection of the district, to investigate it by means of test pits.

"(5) That it further appears from the evidence that there was in the office of defendant a typewritten copy of certain government borings made upon or adjacent to the said section F, previous to the time of the letting of said contract to complainant, and a book in the library thereof entitled 'United States Survey of Waterway, 1889,' wherein was also contained a copy of the government inspectors' report of borings numbers 29 and 30. * * * That connected with the report of boring 29 were certain statements, among which were these: 'At a depth of 10 ft. the auger passes from gravel and sand into a vein of hard, dry, blue clay, and work is stopped. * * * At a depth of 24.9 ft. broke into hard, dry, blue clay, in which boring was completed.' That it appears by the evidence that neither the complainant nor Weston had any knowledge or information of the existence of the said Cooley borings or what they indicated, nor the said book 112 and what was contained therein, or of the said government borings or what was indicated thereby; nor does it appear that they knew that Mr. Cooley had pronounced his borings unreliable, and had recommended test pits as absolutely necessary in order to obtain satisfactory information as to the nature of the material to be encountered.

"(6) That the ordinary methods adopted by engineers to ascertain the character of material to be excavated is by borings or by test pits. * * * That while test pits indicate unmistakably the character of the material through which they pass, and are absolutely reliable in that regard, borings are not so reliable; and whether they do or do not indicate with reasonable accuracy the character of the material through which they pass depends largely upon the experience, ability, and skill of the person operating the auger with which the borings are made, and examining the material taken from the borings. * * * That, taking all the testimony into consideration, the master is of the opinion that, while borings made in the peculiar material found upon section F did not indicate clearly the exact material through which they passed, they did, when carefully made by persons possessing

the requisite skill and experience, indicate that material was to be found there in considerable quantities which was hard, intractable, and difficult of excavation; that this is clearly shown by the official reports of the borings made under the direction of Engineer Cooley. That how hard and how intractable, and how difficult of excavation, such material would finally prove to be, was not disclosed by such borings, and could be disclosed only by proper test pits. That it appears from the evidence that the person in charge of the borings made under the direction of Engineer Williams, Mr. Gleason, was a shoemaker, who did not possess in advance the slightest qualification for the work committed to his charge. That before making these borings he had been in the employ of the defendant in the same capacity for about four months. * * * That it seems clear to the master, from a comparison of the reports of borings made under the direction of Engineer Cooley, and those made by the party in charge of Mr. Gleason, that the latter borings were less carefully made than the former, or that the parties in charge thereof were less competent and skillful in ascertaining and indicating their results; since the earlier borings, made under the direction of Engineer Cooley, contained memoranda showing that, in the opinion of those in charge thereof, there was considerable quantity of hardpan or hard material, while the reports made by those in charge of the later borings not only did not indicate such material, but contained no statements which would naturally put any one examining them upon inquiry as to whether such material would not probably be found."

"(10) That some time in March, 1894, complainants first encountered a hard, intractable material, * * * to which different witnesses have applied different names, some calling it an 'indurated clay,' others 'conglomerate rock,' and still others 'hardpan'; that this material is composed in part of a clayey substance, and gravel and small stones pressed closely together and forming a dense, hard material nearly as heavy as solid rock, and which may appropriately be described as inchoate rock, or rock in the process of formation. That complainants attempted to excavate this intractable material with the plant with which they had thus far successfully carried on their excavation, but found it impossible to do so; * * * that, in short, it was impossible to excavate said material without first drilling and blasting the same, as is done in the case of solid rock."

"(16) That complainants continued the work of excavation after the discovery of the intractable material and the notice thereof to the board, not only during the time when said matter was under consideration by the board, and before the 8th day of August, 1894, but also after that time. That such excavation was almost wholly of the soft material,—that is, material other than the intractable material,—and was made at a cost of between 18 and 19 cents per cubic yard; and that nearly all such soft material on section F was so excavated by them. That payments were made to them by the board from time to time on account of such work. That during the months of September and October complainants excavated about 20,000 yards of the intractable material (the amount thereof excavated by them being about 50,000 yards), drilling and blasting the same in order to ascertain as nearly as could be done what would be the cost of such excavation of such material. That it was estimated by them that the cost of the excavation of such hard material, including the wear and tear of the plant and the interest upon their investment, would be 49.8 cents per cubic yard. That it was also estimated that there remained about 600,000 cubic yards of this intractable material to be excavated upon section F.

"(17) That some of the trustees of defendant, who were such at the time of the making of proposals for bids, and at the time of the making of the contract between the complainants and defendant, were familiar, in a general way, with the fact that certain borings had been made by Chief Engineer Cooley, and had, in a general way, known, by his reports and statements to the engineering committee, the results of such borings. That some of said trustees, also, had been present and heard the statements made by General Fitz Simons touching the material likely to be encountered between Summit and Sag. That the certified copy of the government borings was also on file in the office of defendant. That any one of the trustees, had his at-

tention been called thereto, might, if he so desired, have ascertained the results of the Cooley borings and of the government borings on file in the office of defendant, and might have been advised of the fact that information was contained therein other than that shown in the profile on file in the office of defendant, and differing considerably therefrom, before said proposal for bids was made and said profile examined by complainants. That it does not, however, appear from the evidence that said trustees, or any of them, at the time when this contract was made, had any actual knowledge of the existence of said intractable material. That it should be remembered that the persons elected as trustees of defendant were, at the time of their election, engaged in various occupations. That most of them were wholly unfamiliar with engineering, and had had no previous experience in the prosecution of an enterprise like that undertaken by defendant. That it could scarcely be expected that all the details of an undertaking of such great magnitude, involving an immense expenditure of money, and an almost infinite amount of detail, should be fully investigated or clearly understood by each member of the board. That the evidence affords no ground for believing, nor, is it charged by complainants, that said trustees or any of them knowingly or deliberately intended, by means of said profile, to deceive bidders as to the character of the material to be excavated upon the sections shown in said profile, nor that they or either of them knowingly and intentionally caused said profile to be made in such manner that it failed to show fairly whatever knowledge or information touching the character of said material so to be excavated was in the possession of the board or of its officers. That the evidence, however, does clearly show that all the information in the possession of the board through the Cooley borings and the government borings was not fully and fairly shown on said profile, nor on any other profile then contained in the office of defendant; nor were complainants or Engineer Weston advised by said trustees, or any of them, or by the chief engineer of defendant, or otherwise, that such borings had been made; nor were they advised, nor did they know that General Fitz Simons had appeared before the engineering committee of defendant and had made the statements hereinbefore set forth."

The theory of the decision below is indicated by the following extracts from the opinion of the court, for which see Ricker v. Sanitary Dist., 89 Fed. 251:

"Now, without presuming that the engineer, or any of the members of the board of trustees, knew of the existence of this substance, or even suspected it to exist, it was, nevertheless, within the power of the engineer to have ascertained this fact, with a reasonable degree of certainty, from the previous investigations made on that subject. Here was a great waterway to be put through, necessitating an expenditure of money and energy never excelled, if equaled, in the history of civilization. The engineer of such an undertaking was, in my judgment, called upon to employ every available means to procure such data as would give all the contractors an adequate and full knowledge of all the materials to be dealt with in the process of excavation, thus putting it in their power to intelligently submit proposals and estimates for the work. * * * In view of these facts, I must assume that the data furnished from these several sources were not beyond the reach of some of the persons connected with the management of the canal, and ought to have been within their knowledge, had the management of this enterprise been thoroughly efficient, or even reasonably careful. Knowledge of the conditions to be met, so far as was reasonably practicable, ought to have been the essence of the contract. Upon the character of that soil depended, in a large measure, the actual cost of the canal. * * * I am led to believe that these prior investigations could have been obtained by the defendant, and, in every sense of the word, should rightly have been put in the possession of the complainants, so that they might be correctly guided in their proposals and estimates on the material to be handled. The suppression of all such prior information unquestionably worked a hardship, if not a fraud, upon the complainants. I am of the opinion that if the trustees, either by actual fraud or by carelessness, kept any facts relative to the material to be excavated from the complainants, they are guilty of negligent performance of their duty."

··· John P. Wilson and W. M. McEwen, for appellant.

S. S. Gregory and William Thompson, for appellees.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

WOODS, Circuit Judge, after stating the facts, delivered the opinion of the court.

We are of opinion that the decree under review rests upon an erroneous theory. The contract which the court ordered annulled was made by parties dealing at arm's length. The sanitary district stood in no relation of trust or confidence, and owed no duty, to proposing contractors. The trustees of the district and their chief engineer, it might well be said, were bound in duty to the public to use diligence to obtain such knowledge of the conditions to be dealt with as was necessary to enable them, in letting contracts, to conserve the public interests, but there has been pointed out no provision in the statute whereby the drainage district was created and the powers of its officers defined, which required that information concerning the nature of materials to be excavated should be collected for the benefit of bidders, and for the assertion of such duty on the general principles of law or equity there is, we believe, no foundation in authority or reason. If conceded, the proposition would mean that every representation made by public officials or trustees, appointed to obtain proposals for the execution of a public work, amounts to a warranty either that the representation is true or that experienced and skillful agents had been employed to obtain the information on which it was made, and that the agents had followed the best known methods and had been guilty of no negligence in the discharge of their duties; or, to say the least, that, if such representations are not to be regarded as warranties, either of the truth of the statements or of due diligence used to make them true, they do demonstrate, if they turn out to be untrue, a mutual mistake of the parties, by reason of which the bidder may abandon his contract, once he discovers in the course of performance that the representations were false or mistaken. The books would be searched in vain for precedents or principles to sustain such a doctrine. The possibilities which it would involve of peril to public interests are infinite. It would take from the contractor, and impose on the public, all undiscovered contingencies and risks, which by diligence might have been found out, incident to the construction of public works.

If, in this case, the trustees or their engineer were at fault for employing unskilled men to make the borings in section F, the breach of duty was to the public, as represented by the drainage district, and the appellees had no ground for complaint, even assuming that the profile by which they are said to have been misled had purported to give information full and definite enough to justify reliance upon it, unless, by somebody authorized to speak for the district, they were purposely induced to believe that the borings had been skillfully made and tabulated. The bill contains no averment of the lack of skill or of negligence on the part of those who were employed to conduct the borings, and it is not pretended that the appellees supposed

that they were made by the chief engineer, Williams, in person. When, therefore, he declared to them his belief that the data of the profile were reasonably reliable, they knew that he was expressing only an opinion; and, as their own testimony shows, they did not inquire how or from what the profile was made up, or how and by whom the borings were made. The only reason Williams gave for his belief that the data could be regarded as reliable was that the "determinations were carefully taken and tabulated"; and by that he did not mean, and was not understood to mean, that he had any knowledge of the degree of care with which the borings had been conducted and the results first noted. That neither he nor Ricker and Weston treated the profile as affording full and satisfactory information, as it plainly did not, is shown by the fact that, when they spoke of their intention to go down the line, he declared it a good idea, and suggested that they examine the spoil bank of the Illinois and Michigan canal, which he thought would afford as good evidence as any they could find of what they would meet with in digging the canal. One of the appellees has testified, and the master has found, that in making their bid the appellees relied upon the data found on the profile which they were allowed to examine; but that finding, at best, is only partially true. The appellees were aided by and were acting upon the advice of their own engineer, who was interrogated upon the point three or more times, with the evident purpose to procure an answer like that of his employer; but he adhered steadily to the statement, "We relied upon the information which we obtained from the engineering department of the sanitary district, and our observation of the spoil bank of the Illinois and Michigan canal." Cooley distrusted the data furnished by his own borings, and it is not strange that Weston was unwilling to say that he relied alone upon the indefinite data of the profile shown him. His testimony shows that they made inquiries of two others in the engineering department besides Williams, and that they applied to him not in his official capacity, but individually, "for such information as he had personally of this ground, outside of what he had been able to gather." They examined the spoil bank of the canal more than once, and, finding only tractable material, were of course the more ready to believe that the material described on the profile, though without any statement whether it was hard or not, was also tractable; and by the same logic Williams, who presumably had examined the spoil bank, had a right to believe, and to say to the appellees that he thought, the notations on the profile reliable. If there was a failure to examine the spoil bank of the canal with due care, the opportunity was open alike to both, and neither may complain of the other on that score. It will not do to say that the appellees were not put upon inquiry, or that the profile caused them to refrain from inquiry. From the examination of the profile and other documents in the engineer's office, and from their talks with Williams and others in his office, they proceeded forthwith to make inquiry; and if not with sufficient care, the fault was their own.

We have proceeded thus far on the assumption that what the engineer said about the profile was in some measure binding upon

the board of trustees or the drainage district. While we do not question that the master was right in finding, or assuming, that the engineer had authority to exhibit the profile to contractors, though it was not a part of the specification and plans referred to in the advertisement for proposals, it does not follow, and no facts or circumstances are reported from which it may be inferred, that he had authority to bind the board of trustees or the district by representations of fact outside of the papers which he was authorized to show, and certainly not by expressions of opinion and belief or the grounds thereof. If his statement that he thought the data of the profile trustworthy was in any wise binding on the board of trustees, equally binding, and, as it turned out, equally untrue, was his suggestion that the spoil bank of the canal would be as good evidence as any to be had. Furthermore, the testimony of Weston, the engineer of the appellees, shows that what he "was particular to ask" of Williams was where the proposed channel would come close to the old canal, and if he thought there would be much seepage of water from the old channel into the new; to which Williams answered "No." If his answer had proven untrue, and bothersome seepage had been the cause of complaint, instead of indurated clay, it would hardly be contended that the drainage district was responsible for the statement of the engineer on that point; and yet there seems to be in principle as much reason for asserting authority for one utterance as the other. The engineer had no special authority by statute or by action of the board of trustees, and we cannot assent to the view that he had general authority, by virtue of his office, to speak for the drainage district in respect to matters, like those in question, touching the interests of contractors proposing to enter into engagements to do the work of excavation. The equity of the case, therefore, is as if the particular statements which the master has reported had not been made.

The principles underlying the conclusion already declared are inconsistent with the proposition, in the master's findings of law, that, while the drainage district was under no obligation to give any information to the complainants touching the character of material likely to be encountered in section F, yet, when it did make and exhibit a profile for the information of bidders, it was bound in good faith to communicate to them, also, all the information in its possession on the subject, namely, the reports of the Cooley borings, the government borings, and the statements of General Fitz Simons made before the engineering committee of the defendant. The drainage district was represented by its board of trustees, not by the individuals who composed the board, and could be bound by the action of the board, directly or through agents empowered to act or speak for it, but not by the knowledge or conduct of its individual members. It is not material, therefore, that some of the trustees, at the time of the making of the contract with the appellees, were familiar in a general way with the fact that Cooley, when chief engineer, two years or more before, had made borings, and by his reports had known the results of such borings; or that some of the trustees, two years or more before, had been present and heard the statements of General Fitz Simons to a committee of engineers; or that the certified copy of the

government borings was also on file in the office of the defendant. The important and controlling finding is that the evidence does not show that the trustees, or any of them, at the time when this contract was made, had any actual knowledge of the existence of said intractable material, or that they intended any deceit. The drainage district was not originally, and by nothing that occurred did it come, under obligation to the appellees that its trustees should recall and communicate to them facts of the past, which they had forgotten, and of the significance of which, being men without experience in engineering, they had little or no understanding when they were told of them. While the reports of the Cooley borings and the government borings were on file in the office, and in that sense were in the possession of the defendant, the fact is of no significance unless they were brought to the attention and comprehension of the board under circumstances which made it the board's duty to give information thereof to the appellees. Nothing of the kind occurred. The appellees made no inquiry whether other borings had been made, or test pits sunk, nor whether the board had other information from any source. If the inquiry had been made, there is no reason to believe that the frankest response would not have been made. The report of the government borings was a matter of public knowledge, accessible to all, and the statements of General Fitz Simons were given publicity at the time in the newspapers of Chicago, and in the natural course of affairs were more likely to have been known to and understood by the engineer of the appellees, who had long been interested in engineering enterprises at that city, than by nonprofessional members of the board of trustees of the drainage district. It would certainly have been an easy matter for the appellees to obtain all the knowledge which it is now insisted the board of trustees should have sought out for them; and on the facts found there is no ground, except the supposed duty of the board in that respect, for the legal conclusion of the master that there was a "concealment," or, as the court below called it, "suppression" of information. The report of the Cooley borings differed from the data of the profile only in the use of the adjectives "hard" and "very hard"; and the very absence of such details from the profile exhibited, in all reason, should have called for explanation to those familiar with such works, as the appellees and their engineer are shown to have been. It is said that the appellees themselves were not bound to put down test pits; but it was their privilege to do so; and it is evident that with small expense, and within two or three days' time, at places where the water did not cover the ground, they could have sunk one pit or more through the loose materials to the depth of 10 or 12 feet, and that by so doing they would have come upon the intractable material. A single pit at the place of a boring would have demonstrated that no inference was to be drawn from the data of the profile beyond what was explicitly stated; and beyond that, from the beginning, there was, in the profile itself, no justification for an inference. So, too, a little digging into the spoil bank of the canal, instead of walking along and kicking at it, would have discovered the real character of material in the bank. The omission to employ such palpable and certain means of accurate information was hardly less than gross negligence.

"Caveat emptor" is a just maxim, and equally the contractor must stand guard for his own interests when making his agreements. "If either party," it was said in Cleaveland v. Richardson, 132 U. S. 318, 330, 10 Sup. Ct. 104, "desires information from the other, he must ask for it; and then he must not be misled or deceived by answers given." In this case, information beyond that given was not asked, and that given was not intended to deceive, nor was it of a character which was likely to deceive a prudent man. "No fraud or culpable artifice" was used by the board to obtain the execution of the contract. It is said in the brief for the appellees that "Mr. Weston, and any engineer, would naturally presume that the district had fully satisfied itself as to the correctness of the determinations [on the profile], from whatever source they were gotten, before it would exhibit them in the manner it did. If it had not satisfied itself, it was a very simple matter for it to have qualified the showings made by stating thereon that the specifications had been taken from borings, and they assumed no responsibility in regard thereto." The obvious response to these propositions is that there was no justification for any such assumption by an engineer as that suggested; that to have indulged it would have been to give strong proof of incompetency or carelessness; and that no fairer or more conclusive denial of responsibility for the character of the materials which might be encountered in the prosecution of the proposed work could have been devised than the provision of the contract for the classification of material, whereby, it is to be observed, hardpan is expressly mentioned as included in glacial drift. With that provision in the contract, the appellees are not in a position to say that they were in any respect misled, or not fairly forewarned of the character of material likely to be met with.

We are also of opinion that if the appellees had the right, on discovery of the intractable material, to repudiate the contract and have it set aside, they lost that right by subsequent conduct. The discovery was made in March, 1894, but the prosecution of the work was continued until late in the ensuing October. Rescission, whether upon the ground of fraud or mistake, is a right which must be asserted promptly, and the excuse set up for the delay in this case is wholly inadequate. It rests largely on alleged assurances of adjustment given by individual members of the board after that body had declared its purpose to insist upon performance of the contract. Those assurances were in no sense binding on the board, and the appellees had no right to rely upon them. The law required the letting of contracts for excavation to lowest and best bidders. But if the contention of the appellees is right, then for six months they were prosecuting their work without a contract, on the assumption that a new agreement would be made, or that in default thereof they would compel compensation on such terms as they might be able to show to be just, and meanwhile they were expending large sums for additional machinery (it seems, illadvisedly), the use and damage to which are to be included in the accounting ordered. Equity can hardly sanction so bald a violation of its familiar rule that one who would rescind a contract must exercise his election at once upon the disclosure of the fraud or mistake which is supposed to justify such action. The proper course for the ap-

pellees was to cease operations, give notice to the board of trustees, and await their response; and, short of an agreement that the work might be continued pending negotiations, without prejudice to the right of rescission, it is difficult to think of a good excuse for departing from the well-established rule. The decree below is reversed, with instruction to dismiss the bill.

Judge SHOWALTER did not participate in this decision.